420 P.2d 964

**Laura R. SUTTER, individually and as Guardian of Jo Ann Sutter, a minor, Petitioner,**

**v.**

**The INDUSTRIAL COMMISSION of Arizona and Arizona Highway Department, Respondents.**

**I CA–IC 114.**

Court of Appeals of Arizona.

Dec. 7, 1966.

Rehearing Denied Jan. 5, 1967.

Review Denied Jan. 24, 1967.

Snell & Wilmer, by Burr Sutter, Phoenix, for petitioner.

Robert K. Park, Chief Counsel, by Arthur B. Parsons, Jr., Dee-Dee Samet, Phoenix, for respondents.

CAMERON, Judge.

This is a writ of certiorari to review the findings and award of the Industrial Commission of Arizona which denied a claim for death benefits in the matter of Fred A. Sutter, deceased.

We are called upon to determine whether the testimony adduced at the hearing before the Industrial Commission of Arizona was sufficient to overcome the presumption against suicide in the death of Fred A. Sutter, an employee of the Arizona Highway Department.

Hearing was held pursuant to petitioner's request on 14 January 1966, and 26 April 1966, both the fund and the petitioner were represented by counsel.

It was stipulated at the hearing that the decedent's body was discovered in a burning automobile on 16 March 1965, by the Sheriff of Pinal County at approximately 12:35 p. m. The automobile was owned by the Arizona State Highway Department and

the vehicle was in the State Highway Yard near Florence Junction, Arizona.

Several of decedent's fellow workmen testified. They all gave testimony which indicated the decedent's attitude was normal and that they noticed nothing unusual in his conduct on the day of the fire.

Del B. Brewer testified that he checked the car track in the yard the evening of the fire. He stated:

"Q: And what did these tracks show?

"A: Well, as far as we could determine the man had drove into the gas pump and gassed up and started out and pulled to the side of the road and stopped."

Fred R. Sutter, decedent's son, testified that his father had been confined to the State Sanitorium with suspected tuberculosis for eight months and that decedent and his widow (petitioner) had suffered financial hardship during his stay in the hospital. He had worked for a week or nine days after leaving the hospital before his death. The son testified his father seemed happy to get back on the job. Decedent worked for the engineering section of the Highway Department and was an inspector and ran a survey crew. The son also testified his father was a heavy smoker.

Another witness testified she had known the decedent for nine or ten years and when questioned stated the following:

"Q: And generally, what was his attitude in the period shortly before his death?

"A: There wasn't much change really. Oh, he was quiet, I mean the evening I did talk to him and see him.

"Q: But as far as you could determine he was normal?

"A: Oh, yes.

"Q: You didn't notice anything unusual?

"A: No."

The testimony of Dr. W. P. Tucker, a physician, indicated that decedent had a drinking problem at one time, and had been voluntarily admitted to a hospital for treatment of his drinking problem. Dr. Tucker testified that he had last seen decedent approximately a month before his death. On examination he stated:

"Q: Well, on what did you base your conclusion that he did not have a tendency toward suicide?

"A: I saw him on many different occasions under the influence * * * and under emotional stress. At many times even to the point of irrationality, and during the time that I knew him over a period of more or less eight years, I never heard him in the most extreme violent passion ever mention or even suggest something that might lead one to think he might be contemplating such an act to hurt himself or others.

"Q: And he did not do such an act during that time?

"A: Ma'am?

"Q: He did not try to do such an act during that period of time?

"A: No. There was no evidence in my records or my association with him that he ever tried."

Regarding the Highway Department automobile decedent was using at the time of his death, decedent's son testified that he had worked in gas stations for a period from 1954 to 1958 and was familiar with the model of automobile which caught fire. He was questioned as follows:

"Q: Was there any problem with that model car in gassing it up?

"A: Yes. In the 1955–56–57 Fords the gas cup was at the rear center of the car and it was level with the gas tank. There was a tendency in that particular model car for an air pocket to form since there was not a gas pipe but a direct entry fill to the gas tank itself.

"Q: What would be the result on occasion of that air pocket forming?

"A: If an air pocket would form, if you were filling the car and you were filling the tank completely, the air

pocket would have to give towards the end of the filling period and there would be a splash back of gasoline.

"Q: Gasoline would splash out of it?

"A: Yes, if you were standing right behind the gas entry.

"Q: Did you yourself on occasion have gasoline splashed on your person?

"A: Yes."

The testimony also indicated that the gasoline pump in the Highway Yard was the old glass-filled type that had to be primed to get the gas out of the gravity-fill hand pump. A witness, Daniel Custis, testified he had filled the same model automobile similar to the death car and had gasoline spill out onto him as described by Fred R. Sutter. Michael Erickson testified that gasoline would leak around the nozzle and drip onto the operator. On cross-examination he testified that the operator could get "a lot" of gasoline on his person in this manner. Mr. Erickson also testified that on occasion Highway Department employees carried gasoline in the State cars for use in priming other vehicles, although it wasn't "condoned".

The Commission called one Ernest L. Martin, Ph.D., an analytical chemist. He testified that he had examined an automobile on 11 May 1965, located in the Highway Yard in Phoenix, Arizona, at the request of the Commission. This was a few days less than two months after the fire. Dr. Martin testified that his investigation showed that the fire was centered in the front seat. There was no burning on the front floor. The left front floor mat showed a ring, the size of a gallon glass jug, which analysis indicated was made by gasoline. There were pieces of broken glass from a jug which showed strong gasoline residue, and there was a plastic cup at the left of the driver's seat which had burned. Two other plastic containers underneath the seat were melted, but were not burned. An unburned package of cigarettes and matches were also recovered from under the front seat. There were small traces of gasoline in the burned residue collected in the back seat of the Ford directly behind the driver's seat. A coat taken from the middle of the front seat showed no gasoline traces on the most careful examination. All of the burned material from the burned front seat that had fallen to the floor showed gasoline residue.

Dr. Martin stated on cross-examination that he could not say when the gasoline got on the upholstery of the car. Dr. Martin did not view the body or examine the decedent's clothing to see if it was burned.

Robert J. Ross, Chief Deputy of the Division of Fire Prevention, City of Phoenix, testified for the petitioner. Mr. Ross testified that at the request of the Industrial Commission Claims Investigator he, in company with the Safety Division Investigator of the Arizona Highway Department, examined a burned automobile on 5 April 1965. It was stipulated by counsel that this was the automobile in which Mr. Sutter died.

Mr. Ross stated on cross-examination that he had been told certain things about the circumstances surrounding the fire presumably by the two investigators who accompanied him. He was told that according to the best information they had, the car had been fueled by decedent himself and that there were traces of gasoline found on his shoes and remnants of his clothing. Based on his investigation and what he was told, he gave as his opinion any theory that the decedent could have spilled gasoline on his trousers by fueling the automobile. After he entered the closed automobile, the gasoline fumes would build up inside the car and could have been ignited by a lighted cigarette causing a flash fire which would have caught his trousers on fire. Decedent's reaction would have been to breathe heavily; inhaling heat, flames and smoke (as the autopsy report indicated) resulting in his losing consciousness. Mr. Ross also stated that the point of origin, in his opinion, would be the feet and legs or the trousers of the decedent.

The Reporter's Transcript of the coroner's inquisition containing the testimony of

Dr. Musgrave who performed the autopsy was admitted in evidence. Dr. Musgrave therein stated he detected a distinct odor of gasoline in decedent's socks, shoes and levis. He concluded that the fire started in the front part of the body.

The law is well settled that where death by external means is shown and there is no proof as to causation, or the circumstances leave the question doubtful, or the proof is conflicting or not inconsistent with an accident, there is a presumption of accidental death which must be overcome by a fair preponderance of the evidence before the trier of fact may find that the death was caused by suicide, Kislowski v. Empire Boarding Stable, 5 A.D.2d 734, 168 N.Y.S. 2d 794 (1957), and this presumption against suicide has been applied to workmen's compensation cases:

> "The presumption against suicide will stand and be decisive of the case until overcome by testimony outweighing the presumption. In determining whether a person has committed suicide, courts are not bound by the rigid rules of the criminal law, but are authorized to act upon circumstantial, as well as direct, evidence. The amount of evidence essential to overcome the presumption against suicide has been variously adjudicated. Some courts hold that there should be a preponderance of evidence, others hold that the presumption is easily rebutted by physical facts clearly inconsistent with it. The concensus of opinion, however, is that when circumstantial evidence is relied upon to establish suicide, the party striving to prove same must prove it by facts excluding every reasonable hypothesis of natural or accidental death."

36 A.L.R. 398, Annotation. Presumption against suicide in workmen's compensation cases.

There is no presumption in favor of suicide, and as between accident and suicide, the law presumes accident until suicide is established by the evidence.

We do not believe the testimony produced at the hearing below is reasonably sufficient to overcome the strong presumption against suicide.

There being insufficient evidence to reasonably support the findings of the Commission, the award is set aside.

STEVENS, C. J., and DONOFRIO, J., concur.